IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
No. 4:14-CV-60-FL

| | |
|---|---|
| DELORES STALLINGS, ) <br> ) <br> Plaintiff/Claimant, ) <br> ) <br> V. ) <br> ) <br> CAROLYN COLVIN, ) <br> Acting Commissioner of Social Security, ) <br> ) <br> Defendant. ) | MEMORANDUM AND <br> RECOMMENDATION |

This matter is before the court on the parties' cross-motions for judgment on the pleadings [DE-25, DE-27] pursuant to Fed. R. Civ. P. 12(c). Claimant Delores Stallings ("Claimant") filed this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3) seeking judicial review of the denial of her application for a period of disability and Disability Insurance Benefits ("DIB"). The time for filing responsive briefs has expired and the pending motions are ripe for adjudication. Having carefully reviewed the administrative record and the motions and memoranda submitted by the parties, it is recommended that Claimant's Motion for Judgment on the Pleadings be allowed, Defendant's Motion for Judgment on the Pleadings be denied, and the final decision of the Commissioner be remanded.

## I. STATEMENT OF THE CASE

On November 2, 2010, Claimant protectively filed an application for a period of disability and DIB alleging disability beginning on October 31, 2008. (R. 20, 155). Her claim was denied initially and upon reconsideration. (R. 86-95). A hearing before the Administrative Law Judge ("ALJ") was held on November 13, 2012, at which Claimant was represented by counsel and a vocational expert ("VE") appeared and testified. (R. 31-61). On December 14, 2012, the ALJ issued

a decision denying Claimant's request for benefits. (R. 17-29). On February 8, 2014, the Appeals Council denied Claimant's request for review. (R. 1-6). On April 11, 2014, Claimant then filed a complaint in this court seeking review of the now final administrative decision. [DE-1, -6].

## II. STANDARD OF REVIEW

The scope of judicial review of a final agency decision regarding disability benefits under the Social Security Act ("Act"), 42 U.S.C. § 301 *et seq.*, is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). While substantial evidence is not a "large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988), it is "more than a mere scintilla . . . . and somewhat less than a preponderance." *Laws*, 368 F.2d at 642. "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996), *superseded by regulation on other grounds*, 20 C.F.R. § 416.927(d)(2)). Rather, in conducting the "substantial evidence" inquiry, the court's review is limited to whether the ALJ analyzed the relevant evidence and sufficiently explained his or her findings and rationale in crediting the evidence. *Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

2

## III. DISABILITY EVALUATION PROCESS

The disability determination is based on a five-step sequential evaluation process as set forth in 20 C.F.R. § 404.1520 under which the ALJ is to evaluate a claim:

> The claimant (1) must not be engaged in "substantial gainful activity," i.e., currently working; and (2) must have a "severe" impairment that (3) meets or exceeds [in severity] the "listings" of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform . . . past work or (5) any other work.

*Albright v. Comm'r of the SSA*, 174 F.3d 473, 475 n.2 (4th Cir. 1999). "If an applicant's claim fails at any step of the process, the ALJ need not advance to the subsequent steps." *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (citation omitted). The burden of proof and production during the first four steps of the inquiry rests on the claimant. *Id.* At the fifth step, the burden shifts to the ALJ to show that other work exists in the national economy which the claimant can perform. *Id.*

When assessing the severity of mental impairments, the ALJ must do so in accordance with the "special technique" described in 20 C.F.R. § 404.1520a(b)-(c). This regulatory scheme identifies four broad functional areas in which the ALJ rates the degree of functional limitation resulting from a claimant's mental impairment(s): activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation. *Id.* § 404.1520a(c)(3). The ALJ is required to incorporate into his written decision pertinent findings and conclusions based on the "special technique." *Id.* § 404.1520a(e)(3).

In this case, Claimant alleges the ALJ improperly evaluated the medical opinion evidence and, in doing so, failed to provide persuasive reasons for discounting Dr. Albert's consultative examining opinion. Pl.'s Mem. Supp. Pl.'s Mot. J. Pleadings ("Pl.'s Mem.") [DE-26] at 1-8.

3

## IV. FACTUAL HISTORY

### A. ALJ's Findings

Applying the above-described sequential evaluation process, the ALJ found Claimant "not disabled" as defined in the Act. At step one, the ALJ found Claimant did not engage in substantial gainful employment during the period from her alleged onset date through her date of last insured. (R. 22). Next, the ALJ determined Claimant had the following severe impairments: history of right rotator cuff tear, diabetes mellitus, hypothyroidism, obesity, post-traumatic stress disorder (PTSD), depression, and low intellectual functioning. *Id.* However, at step three, the ALJ concluded these impairments were not severe enough, either individually or in combination, to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* Applying the technique prescribed by the regulations, the ALJ found that Claimant's mental impairments have resulted in mild restrictions in her activities of daily living, moderate difficulties in social functioning and concentration, persistence and pace, and no episodes of decompensation, which have been of extended duration. (R. 23-24).

Prior to proceeding to step four, the ALJ assessed Claimant's RFC, finding Claimant had the ability to perform light work[1] as defined by 20 C.F.R. § 404.1567(b) with the following restrictions: only occasional climbing of stairs or ramps, never ropes, ladders or scaffolds; avoiding hazardous machinery; and occasional overhead reaching with the right arm. (R. 24). Claimant is also limited

---

[1] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If an individual can perform light work, he or she can also perform sedentary work, unless there are additional limiting factors such as the loss of fine dexterity or the inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

Case 4:14-cv-00060-FL Document 30 Filed 07/01/15 Page 4 of 18

to simple, routine, repetitive tasks in a low production/stress occupation that requires no complex decision making, constant change or dealing with crisis situations, and should also have only occasional contact with the general public and frequent but not constant contact with co-workers. *Id.* In making this assessment, the ALJ found that Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. (R. 25). However, the ALJ concluded that Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they are inconsistent with her RFC. *Id.*

At step four, the ALJ concluded Claimant did not have the RFC to perform the requirements of her past relevant work. (R. 28). Nonetheless, at step five, upon considering Claimant's age, education, work experience and RFC, the ALJ determined Claimant is capable of adjusting to the demands of other employment opportunities that exist in significant numbers in the national economy. (R. 28-29).

**B.   Claimant's Testimony at the Administrative Hearing**

At the time of Claimant's administrative hearing, Claimant was 54 years old and a high school graduate. (R. 38). She was last employed by Electrolux from 2003-2008 as a dishwasher inspector, in which capacity she was required to perform pulling but no lifting. (R. 38-39). While at Electrolux, Claimant also worked on a dishwasher assembly line. (R. 40). Prior to 2003, for a period of about two and a half years, Claimant worked at a grocery store deli serving food and operating the cash register. (R. 39). She was laid off from her position at Electrolux in 2008. (R. 41). However, prior to being laid off, Claimant had difficulties focusing on her job, which she attributes to an incident involving one of her brothers attempting to attack her, having already molested her at an early age. (R. 40-41). Claimant attempted to find a job and received

5

unemployment benefits until they were exhausted. (R. 41-42).

Claimant spends her days sitting at home watching television. (R. 42). She takes a lot of pain medication and sleeps and cries frequently. *Id.* Claimant shops for groceries with her husband but sometimes he goes by himself. *Id.* She does not attend church or social functions and is not able to go to the mall or out to dinner. (R. 43). Claimant is able to drive but does not drive far and always with her husband. *Id.* She has reduced the frequency she talks to family for fear that this would bring the brother who molested her to see her. *Id.* Claimant does not maintain any contact with friends and has no children. (R. 43-44). Her husband takes care of the bills. (R. 44). Claimant suffers from diabetes and takes insulin as needed as well as four pills a day. (R. 51). As a side effect of the medication, Claimant experiences diarrhea four to six times before noon. (R. 44, 51-52).

Claimant thinks she injured her right shoulder when lifting a rack at work. (R. 45). When Claimant visited an orthopedist she was told she had injured her right rotator cuff and was provided injections. *Id.* She has received additional injections from her regular doctor. (R. 47-48). She takes Tylenol for her shoulder pain. (R. 50). Claimant cannot raise her right arm above her head but she can open and close a fist with her right hand. (R. 46-47). She is able to lift her left hand above her head, and has trained herself to do things around the house using her left hand. (R. 47). Although Claimant is right-handed and is able to write with her right hand, she has started eating and doing other things with her left hand. *Id.* When she shops with her husband she is unable to assist lifting items into the shopping cart and does not carry groceries into the house. (R. 46).

Claimant also experiences leg pain. (R. 48). She does not know what causes her leg pain, and her legs hurt all the time especially when standing. *Id.* Claimant experiences pain in both legs on a daily basis, since about January 2011, which her doctor told her was due to neuropathy related

6

to her diabetes and her medication. (R. 49-50). Due to her pain, Claimant can stand for 15-20 minutes, after which she sits or lies down, elevates her legs for 45-70 minutes, and takes Tylenol. (R. 49-51). Claimant describes her pain as an eight or nine (out of ten) after standing for 15-20 minutes. (R. 51). Her pain is reduced to a four (out of ten) after resting for 45 minutes and taking her medication. *Id.*

Claimant has not received treatment from any doctors regarding her mental health. (R. 53). At the outset of the hearing, Claimant's counsel told the ALJ that Claimant's molestation by one of her brothers was not known to Claimant's husband and that Claimant has purposefully avoided seeking mental health treatment in order to not "raise any questions from her husband." (R. 36). Counsel also offered this as a reason the mental health record in this case is limited.[2] *Id.* During questioning, Claimant's counsel asked Claimant the following:

> Q: And you heard me tell the Judge earlier, based on our conversation, you told me you don't do that [seek mental health treatment from doctors] because you don't want your husband to ask questions.
>
> A: No, sir.

(R. 53). Claimant feels her mental health and depression keep her from working. *Id.* She feels embarrassed and cannot concentrate on anything, and she describes herself as paranoid, i.e., she always thinks people are talking about her. *Id.* She only leaves the house to go to the grocery store and does not leave without her husband. *Id.* Before 2008, when she was most recently attacked by her brother, she did not have any issues dealing with her co-workers nor did she have any feelings of paranoia. (R. 54). Rather, she had friends, socialized, and attended church. *Id.* Both she and her

---

[2] The ALJ agreed to counsel's request to take measures in sending the ALJ's written decision directly to counsel rather than to Claimant in order to avoid Claimant's husband from reading the decision and learning of Claimant's molestation. (R. 36).

7

husband perform household duties and cleaning and cooking, but she does not vacuum. *Id.* She tries to cook meals and wash dishes but her husband gets out the pots and cooking materials. *Id.* Usually she prepares simple meals, and her husband does the laundry. *Id.*

## C.    Vocational Expert's Testimony at the Administrative Hearing

Ashley Johnson testified as a VE at the administrative hearing. (R. 55). After the VE's testimony regarding Claimant's past work experience, the ALJ asked the VE to assume a hypothetical individual of the same age, education and prior work experience as Claimant. (R. 55-56). The ALJ asked whether the individual could perform Claimant's past relevant work assuming the individual has the physical capacity to perform light work involving simple, routine and repetitive tasks with limitations that include occasional climbing of stairs and ramps, never climbing of ropes, ladders or scaffolds, avoiding occupations with hazardous machinery, occasional overhead reaching with the right arm, and working in an environment of low production, low stress which would require no complex decision-making, constant change, or dealing with crisis situations. (R. 56).

The VE testified such hypothetical individual could not perform Claimant's past work as she performed it or as it is performed in the national economy. *Id.* However, the VE described occupations that the hypothetical individual could perform: (1) cashier II (DOT 211.462-010), light in physical demand with an SVP level of 2 and unskilled, and performed by 37,000 people in North Carolina and 1,125,000 people in the United States; (2) shipping/receiving weigher (DOT 222.387-074), light in physical demand with an SVP of 2 and unskilled, and performed by 2,500 people in North Carolina and 76,000 people in the United States; and (3) sales attendant (DOT 299.677-010), light in physical demand with an SVP level of 2, and performed by 2,900 people in North Carolina

8

and 90,000 people in the United States. (R. 56-57).

The ALJ then asked the VE if her response would change if she were to assume further that the same hypothetical individual should have only occasional contact with the general public and frequent but not constant contact with co-workers. (R. 57). The VE testified the shipping/receiving weigher position would remain, however, the two other jobs would be eliminated. *Id.* The VE provided other examples of positions available to the hypothetical individual: (1) electronics worker (DOT 726.687-010), light in physical demand with an SVP level of 2, and performed by 1,000 people in North Carolina and 38,000 people in the United States, and (2) housekeeper (DOT 323.687-014), light in physical demand with an SVP of 2, and performed by 10,000 people in North Carolina and 377,000 people in United States. (R. 57-58). The ALJ asked the VE whether her response would change if she were to assume further that the same hypothetical individual would miss work four or more days per month for various reasons. (R. 58). The VE responded that in her opinion the number of absences would not be tolerated by any employer. *Id.*

Claimant's counsel then inquired of the VE with regard to the ALJ's second hypothetical, whether being able to stand for 15 minutes and needing a 45 minute break would allow for any light duty work. *Id.* The VE responded that the electronics worker and shipping/receiving weigher positions could be performed with a sit/stand option. *Id.* The VE stated further the numbers would be reduced by 75% to reflect employers what allow for a chair or a stool to be used in the workplace, but that these jobs may be performed in a seated position. *Id.* The VE testified further that the availability of elevating the feet above waist level would not be allowed with the sit/stand option and such a condition would eliminate such work. (R. 58-59).

Again with regard to the ALJ's second hypothetical, Claimant's counsel inquired of the

9

availability of work if such a person would need to avoid all stress and pressure with any job and whether such conditions would allow for any of the three jobs described. (R. 59). The VE responded that someone's perception of stress is very subjective. *Id.* The VE testified further that any employer is going to require that some product be produced or service be provided, and that if someone is unable to tolerate the stress and pressure related to performing work, then such a condition would eliminate employment. *Id.*

The VE testified that the DOT does not address the sit/stand option, work absences, the need to elevate legs, stress or pressure associated with work, nor does the DOT specifically address public contact, low stress work, occasional overhead reaching, or simple, repetitive, routine tasks. *Id.* For those areas not covered by the DOT, the VE relied on her knowledge, education, experience and training in her responses to questioning. (R. 59-60).

## V. DISCUSSION

### A. The ALJ's Evaluation of the Mental Health Evidence

Claimant contends that the ALJ erred in evaluating the opinion of Dr. Jerome B. Albert, PH.D., who performed a consultative mental status examination of Claimant, and in failing to discuss Claimant's asserted reasons for not seeking mental health treatment. Pl.'s Mem. [DE-26] at 4-8. The Commissioner contends that the ALJ's decision is supported by substantial evidence in the record, including Claimant's failure to seek treatment from a mental health professional or from her primary care physician, to whom she rarely reported psychiatric complaints; inconsistencies between Dr. Albert's opinion and his clinical findings; and that the ALJ relied on evidence aside from Claimant's failure to seek mental health treatment in giving little weight to Dr. Albert's opinion. Def.'s Mem. [DE-28] at 7-12. The undersigned agrees with Claimant that the ALJ's

10

reasons for discounting Dr. Albert's opinion are not persuasive and the ALJ should have discussed Claimant's asserted reason for not seeking mental health treatment.

Regardless of the source, the ALJ must evaluate every medical opinion received. 20 C.F.R. § 404.1527(c). In general, the ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* § 404.1527(c)(1). More weight is generally given to opinions of treating sources, who usually are most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability, than non-treating sources, such as consultative examiners. *Id.* § 404.1527(c)(2). However, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590. While an ALJ is under no obligation to accept any medical opinion, *see Wireman v. Barnhart*, No. 2:05-CV-46, 2006 WL 2565245, at *8 (W.D. Va. Sept. 5, 2006) (unpublished), he must nevertheless explain the weight afforded such opinions. *See* S.S.R. 96-2p, 1996 WL 374188, at *5 (July 2, 1996); S.S.R. 96-6p, 1996 WL 374180, at *1 (July 2, 1996). An ALJ may not reject medical evidence for the wrong reason or no reason. *Wireman*, 2006 WL 2565245, at *8.

On or about May 7, 2011, Claimant was referred to Dr. Albert for a psychological evaluation by the North Carolina Disability Determination Services. (R. 417). Dr. Albert's examination is the only mental health examination of Claimant in the record. Claimant related to Dr. Albert that she was molested by three of her brothers when she was a child and experiences PTSD from these events. *Id.* According to Dr. Albert's evaluation report, "she has even told her husband about it" and Claimant told Dr. Albert that she had a therapist. *Id.* Claimant also reported her PTSD intensified three years ago when one of her brothers contacted her, and she has never sought mental

11

health treatment nor has she been hospitalized. *Id.* She reports having flashbacks and nightmares. *Id.* She was driven to the evaluation by her husband who waited outside in the car. *Id.*

As noted by the ALJ, on Claimant's mental status examination with Dr. Albert she was oriented and her thinking was focused and coherent, without evidence of psychosis, and she scored in the range of severe depression on the Beck Depression Inventory II. (R. 26, 418). Dr. Albert also noted Claimant has flashbacks, intrusive thoughts, dreams, and startle responses involving sexual molestation; feelings of sadness, pessimism, past failure, loss of pleasure, guilt feelings, punishment feelings, self-dislike, and self-criticalness; suicidal thoughts that she would not carry out; anxiety disorder with panic attacks; PTSD from being molested; and major depression, which is moderate in nature. (R. 418-19). Dr. Albert indicated Claimant was in need of psychiatric follow up as well as psychotherapy. (R. 419). Dr. Albert diagnosed Claimant with PTSD, chronic anxiety disorder, and major depression, which is moderate in nature, and awarded a GAF score of 50. *Id.* He indicated Claimant can understand, retain, and follow simple directions, but may have difficulty sustaining attention to perform routine repetitive tasks during an 8:00 a.m. to 5:00 p.m. job and may have difficulty getting along with fellow workers and supervisors because of her PTSD or anxiety and depression. *Id.* Dr. Albert concluded that he believed "it will be difficult if not impossible for [Claimant] to tolerate the stress and pressure associated with day-to-day activities." (R. 420).

The ALJ noted Claimant's GAF score of 50, indicating serious difficulties in overall functioning, but concluded the estimate was not credible because it was inconsistent with Claimant's mental status examination showing Claimant exhibited no evidence of psychosis, hallucinations or delusions which would be expected for one functioning in the serious range of impairment. (R. 26, 418). The ALJ also noted examinations from Claimant's primary care provider indicating Claimant

12

remained alert and oriented with no unusual anxiety or evidence of depression. (R. 26) (citing Exs. 13F, 15F, & 17F). The ALJ determined that Claimant's allegations of disabling symptoms and limitations could not be accepted. (R. 26-27). In reaching this conclusion, the ALJ observed that "the record contains little evidence that the claimant is seeking treatment for her mental health condition" and that the only evidence of record from a mental health specialist is the consultive examination.[3] (R. 26).

First, the ALJ drew a negative inference about Claimant's symptoms and their functional effect from her failure to seek mental health treatment. (R. 26). Frequent medical visits "generally lend support to an individual's allegations of intense and persistent symptoms." S.S.R. 96-7p, 1996 WL 374186, at *7 (July 2, 1996). In contrast, however,

> [an] individual's statements may be less credible if . . . records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure. However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.

*Id.* Here, the ALJ's discussion lacks any indication he considered Claimant's proffered reason for not seeking treatment—concern that her husband would learn of her molestation by her brothers—which appears in the hearing transcript. (R. 52-54). *Cf. Jones v. Astrue*, No. 5:07-CV-452-FL, 2009 WL 455414, at *19 (E.D.N.C. Feb. 23, 2009) (unpublished) (adopting memorandum and recommendation finding no error where the ALJ *discussed* and ultimately rejected Claimant's purported reasons for not being forthcoming about her complaints); *see also Buckler v. Astrue*, No.

---

[3] It appears the ALJ also relied on Claimant's sporadic mental health treatment in discounting the opinions of Claimant's husband. (R. 27).

13

CIV. A. 1:07-CV-1414, 2008 WL 2486133, at *9-10 (M.D. Pa. June 17, 2008) (unpublished) (finding error, despite claimant's "somewhat inconsistent claims as to why she did not seek regular mental health treatment during the relevant period," where claimant testified at the hearing regarding her lack of mental health treatment but the ALJ did not address those explanations in the decision). While Dr. Albert's notes appear to indicate that Claimant may have told her husband of the molestation (R. 417), this compels further examination of Claimant's proffered reasons for not seeking mental health treatment and it is not the court's role to resolve such conflicts in the evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) ("Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence.").

Furthermore, although the Commissioner suggests the ALJ's reliance on Claimant's rare psychiatric complaints and consistent reports of no depression or anxiety to her primary care providers are sufficient to support the ALJ's assessment of Claimant's mental impairments, Def.'s Mem. [DE-28] 11-12, Claimant's proffered reason for not seeking mental health treatment may well apply not only to seeking mental health treatment from specialists, but likewise from seeking mental health treatment from her primary care providers. The Commissioner also suggests that Claimant has failed to carry her burden and that her argument—"that if she had sought treatment, such treatment would have showed an inability to work"—is purely speculative and cannot be verified by the court or the ALJ due to the lack of evidence suggesting disability. Def.'s Mem. [DE-28] at 11. Yet, the purpose of Dr. Albert's consultative exam was to fill that evidentiary gap, and Dr. Albert's opinion is consistent with Claimant's position (R. 419-20). *See* 20 C.F.R. § 404.1519a ("We may purchase a consultative examination to try to resolve an inconsistency in the evidence,

14

or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim. Some examples of when we might purchase a consultative examination to secure needed medical evidence . . . include but are not limited to: (1) The additional evidence needed is not contained in the records of your medical sources. . . .").

The ALJ's analysis of Dr. Albert's opinion was also potentially impacted by the ALJ's error. The ALJ noted in discounting Dr. Albert's opinion that Claimant's primary care provider indicated Claimant remained alert and oriented with no unusual anxiety or evidence of depression throughout her course of treatment. (R. 26-27). Claimant points out that an August 18, 2011 treatment note, not discussed by the ALJ, reflects she was positive for anxiety, depression, inability to focus, picking, psychiatric symptoms, and sleep disturbances, but negative for prior hospitalization and suicidal ideation. (R. 480). However, Claimant was noted to be "alert and oriented" with "no unusual anxiety or evidence of depression" on October 9, 2009 (R. 497), March 10, 2011 (R. 486), and April 23, 2012 (R. 551). The ALJ is not required to discuss every piece of evidence and it is unquestionably within the ALJ's discretion to weigh evidence such as these treatment notes. Notwithstanding, as discussed above, it is unclear from the ALJ's discussion whether he gave the requisite consideration to Claimant's proffered reason for failing to seek treatment regarding her mental health issues, S.S.R. 96-7p, 1996 WL 374186, at *7, and this impacted the ALJ's evaluation of Dr. Albert's opinion. This is particularly significant where Dr. Albert's is the sole opinion regarding Claimant's mental health by an examining physician in the record. Accordingly, the ALJ's failure to explain his consideration of Claimant's proffered reason for not seeking mental health treatment was not harmless error and requires remand.

Claimant also takes issue with the ALJ's evaluation of Claimant's Global Assessment

15

Functioning (GAF) score in the discussion of Dr. Albert's opinion. Pl.'s Mem. [DE-26] at 6-7. "The GAF scale is a method of considering psychological, social, and occupational function on a hypothetical continuum of mental health. The scale ranges from 0 to 100, with serious impairment in functioning at a score below 50." *Taylor v. Colvin*, No. 5:12-CV-779-FL, 2014 WL 1233042, at *2 (E.D.N.C. Mar. 25, 2014) (unpublished) (citing Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 32 (4th ed. 2002) ("DSM-IV")). The Social Security Administration has been clear that GAF scores do not "have a direct correlation to the severity requirements in [the social security] mental disorders listings." *Wiggins v. Astrue*, No. 5:11-CV-85-FL, 2012 WL 1016096, at *8 (E.D.N.C. Feb. 2, 2012) (citations and internal quotation marks omitted), *adopted by* 2012 WL 1016055 (E.D.N.C. Mar. 22, 2012); *see also* Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000) ("The GAF scale, which is described in the DSM-III-R (and the DSM-IV), is the scale used in the multiaxial evaluation system endorsed by the American Psychiatric Association. It does not have a direct correlation to the severity requirements in our mental disorders listings."). Additionally, the GAF scale was dropped from the DSM-V due, in part, to its "conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) . . . ." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, 16 (5th ed. 2013). Even so, the ALJ must consider a claimant's GAF score along with all of the record evidence. *Atkinson v. Astrue*, No. 5:10-CV-298-FL, 2011 WL 3664346, at *11 (E.D.N.C. July 20, 2011) (unpublished), *adopted by* 2011 WL 3664858 (E.D.N.C. Aug. 17, 2011) (quotations omitted).

The ALJ found Dr. Albert's assignment of a GAF score of 50 to be "not credible because it is inconsistent with the mental status examination, which shows that the claimant exhibited no

evidence of psychosis, hallucinations, or delusions, which would be expected of a person functioning in the serious range of impairment." (R. 26) (internal citation omitted). A GAF score of 41–50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV at 32; *see Taylor*, 2014 WL 1233042, at \*3 (citing *Pate–Fires v. Astrue*, 564 F.3d 935, 944 (8th Cir. 2009) (collecting cases finding that a GAF score below 50 can evidence substantial impairment of an individual's ability to work)). The symptoms the ALJ found lacking appear more relevant to a GAF score of 21–30, which indicates "[b]ehavior . . . considerably influenced by delusions or hallucinations . . . ." *Id.* Moreover, Dr. Albert diagnosed Claimant with PTSD, chronic anxiety with panic attacks, and major depression, moderate, recurrent (R. 419), which are not necessarily accompanied by "psychotic features" such as delusions or hallucinations. *See* DSM-IV at 376-77 (explaining major depressive disorder can be with or without psychotic features); 393-95, 424-29 (discussing anxiety disorders, panic attacks and PTSD). While the ALJ was by no means required to give controlling weight to Claimant's GAF score, his reason for finding it not credible is questionable and does not provide good reason to discount Dr. Albert's opinion.

Accordingly, where the ALJ failed to explain his consideration of Claimant's proffered reason for not seeking mental health treatment and the reasons given by the ALJ in assigning Dr. Albert's opinion little weight are not well-supported, and it is recommended that this matter be remanded for the ALJ for further consideration.

## VI. CONCLUSION

For the reasons stated above, it is RECOMMENDED that Claimant's Motion for Judgment

17

on the Pleadings [DE-25] be ALLOWED, Defendant's Motion for Judgment on the Pleadings [DE-27] be DENIED, and the final decision of the Commissioner be REMANDED.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until **July 15, 2015** to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct his or her own review (that is, make a de novo determination) of those portions of the Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b). Any response to objections shall be filed by within **14 days** of the filing of the objections.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.** *See Wright v. Collins*, **766 F.2d 841, 846-47 (4th Cir. 1985).**

Submitted, the ___1___ day of July 2015.

_____
Robert B. Jones, Jr.
United States Magistrate Judge

18